777 So.2d 1023 (2000)
David STIVERS, Appellant,
v.
FORD MOTOR CREDIT COMPANY, Appellee.
No. 4D00-389.
District Court of Appeal of Florida, Fourth District.
December 27, 2000.
Rehearing Denied February 16, 2001.
*1024 Diane H. Tutt, and Sharon C. Degnan of Diane H. Tutt, P.A., Plantation, for appellant.
Gina E. Caruso, and Robert K. Tucker of Hinshaw & Culbertson, Fort Lauderdale, for appellee.
GROSS, J.
The question in this case is whether a financing practice that causes only monetary injury is a public hazard within the meaning of section 69.081, Florida Statutes (2000), the Sunshine in Litigation Act (the "Act"). We hold that such a practice is not a "public hazard" within the meaning of section 69.081(2) and affirm the trial court's order granting Ford Motor Credit Company's (FMCC) motion for summary judgment.[1]
In 1992, appellant David Stivers brought suit against his former employer, a car dealership, and various other defendants, including FMCC. Stivers settled the lawsuit with FMCC in 1996. Before the settlement, Stivers had served as an expert witness in consumer lawsuits attacking credit practices pertaining to the sale and lease of automobiles.
As part of the February, 1996 settlement, Stivers received $55,000. Two paragraphs of the settlement agreement provided:
2. Plaintiff, DAVID STIVERS, shall not serve as an expert witness in any investigation, claim, law suit, or administrative action involving FORD MOTOR CREDIT COMPANY;
3. DAVID STIVERS shall not directly or indirectly or by other means, discuss, identify or name FORD MOTOR CREDIT COMPANY, and/or its financing and leasing policies and procedures to any form of the media, whether print, broadcast or otherwise.
In spite of the settlement agreement, Stivers continued to serve as an expert witness in cases involving FMCC.
FMCC initiated an action to enforce the settlement agreement, alleging that Stivers continued to act as an expert witness against FMCC in violation of paragraph two of the agreement. The complaint sought injunctive relief.
In response, Stivers raised the affirmative defense that the settlement agreement was unenforceable since it violated the Act. Stivers counterclaimed for a declaratory judgment that the agreement violated the Act.
Ultimately, the trial court granted FMCC's motion for summary judgment, ruling that section 69.081 did not apply, since economic fraud in the leasing and financing of automobiles, which was the subject matter of Stivers' expertise, was not a "public hazard" within the meaning of section 69.081(2).
Stivers contends that the settlement agreement is unenforceable under section 69.081(4), which provides
[a]ny portion of an agreement or contract which has the purpose or effect of concealing a public hazard, any information concerning a public hazard, or any information which may be useful to members of the public in protecting themselves from injury which may result *1025 from the public hazard, is void, contrary to public policy, and may not be enforced.
Section 69.081(2) defines a "public hazard" as
an instrumentality, including but not limited to any device, instrument, person, procedure, product, or a condition of a device, instrument, person, procedure or product, that has caused and is likely to cause injury.
The statute is broadly drafted. An "instrumentality" is commonly defined as a "means" or "agency." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 633 (1984). The statute gives examples of an "instrumentality" that expand the reach of the term to encompass a "person, procedure, [or] product." The term "injury" is not defined or limited in any way. The legislature did not confine the definition of "injury" to cases involving personal injury or dangers to public health and safety. Compare Tex.R.Civ.Pro.Ann., Rule 76a (requiring a showing that sealing records will not adversely effect "the general public health or safety"); Va.Code Ann. § 8.01-420.01 (Michie Supp.2000) (dealing with protective orders to prevent disclosure of materials relating to personal injury or wrongful death actions).
To properly determine the scope of the statutory term "public hazard," it is necessary "[to] consider the act as a whole, `the evil to be corrected, the language of the act, including its title, the history of its enactment, and the state of the law already in existence bearing on the subject.' "State v. Webb, 398 So.2d 820, 824 (Fla.1981) (quoting Foley v. State, 50 So.2d 179, 184 (Fla.1951)).
Section 689.081 became law in 1990. See Ch. 90-20, § 2, at 50, Laws of Fla. According to one commentator, the statute "sailed though both houses and was signed by the Governor in a matter of days." Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts, 105 HARV. L.REV. 427, 443 (1991). At that time there was a "national movement to attempt to limit the availability of protective orders covering documents and information produced during discovery, particularly in product liability actions." RICHARD A. ROSEN & KAREN S. KENNEDY, NEW DEVELOPMENTS IN STATE PROTECTIVE ORDER LEGISLATION AND PROCEDURAL RULES, C915 ALI-ABA 315, 317 (Feb. 7, 1994). The rationale behind the movement was that protective orders and sealed court records were "being used with increasing frequency to hide deadly product defects" and, as a result, "important information affecting public health and safety [was concealed] from public view." Miller, 105 HARV. L.REV. at 430-31, 442.
The legislative staff analysis of the statute supports the conclusion that section 69.081 arose from concerns about settlements in product liability cases, where health and safety issues were implicated:
Recently, there is a growing concern relating to the practice of settling cases, especially in the products liability area, where as part of the settlement the parties will agree not to disclose information regarding hazardous products, or the court will enter a protective order precluding such disclosure. Typical of this type of situation is the Oregon case of Oberg v. Honda Motor Co. where a jury ruled that Honda manufactured an inherently unsafe three-wheel all terrain vehicle, but the court entered a protective order requiring that all evidentiary documents obtained from Honda which identified the inherent manufacturing flaws be returned to the defendants. Other such instances have been reported in cases against automobile manufacturers and oil corporations.
Fla. H.R. Comm. on Judiciary, SB 278 (1990), Staff Analysis & Economic Impact Statement 2, (final August 28, 1990). While not determinative of legislative intent, legislative staff analyses are "`one touchstone of the collective legislative will.'" White v. State, 714 So.2d 440, 443 n. 5 (Fla.1998) (quoting Sun Bank/South *1026 Fla., N.A. v. Baker, 632 So.2d 669, 671 (Fla. 4th DCA 1994)).
Focusing on the language of the act, we note that a common usage of "hazard" involves a "chance of being harmed or injured." WEBSTER'S II NEW RIVERSIDE DICTIONARY 568 (1984). In other contexts, when the legislature has used the word "hazard," the term has generally connoted an exposure to physical, tangible harm or a danger to health.[2] Florida cases that have used the term "public hazard" have involved health or safety issues. See Everton v. Willard, 468 So.2d 936, 941 (Fla. 1985) (Shaw, J., dissenting) (regarding an intoxicated driver who posed a "public hazard"); City of Miami v. Aronovitz, 114 So.2d 784, 788 (Fla.1959) (stating a driver whose license had been suspended or revoked was a "public hazard"); Lovett v. State, 403 So.2d 1079, 1082 (Fla. 1st DCA 1981) (finding a car that had been involved in a collision was not a "public hazard or nuisance").
Viewing the term "public hazard" in light of the legislative history behind section 69.081, we agree with the trial court that the term connotes a tangible danger to public health or safety. Nothing suggests that the legislature intended to encompass economic fraud causing financial loss within the statutory definition.
Stivers urges that because the statute was "enacted in the public interest," it "should be given a liberal construction in favor of the public." Dep't of Envtl. Regulation v. Goldring, 477 So.2d 532, 534 (Fla.1985). However, when using this rule, "a reasonable construction should be applied giving full measure to every effort to effectuate the legislative intent." City of Miami Beach v. Berns, 245 So.2d 38, 40 (Fla.1971). The rule of construction will not support an interpretation where "there is neither reason nor policy expressed in the language of the statute" to support an expansive reading of it. Turnberry Isle Resort & Club v. Fernandez, 666 So.2d 254, 256 (Fla. 3d DCA 1996).
None of the cases citing section 69.081 are helpful here. This court mentioned the Act in General Motors Corp. v. Dickerson, 654 So.2d 1036, 1037 n. 1 (Fla. 4th DCA 1995), but only to note that it was not at issue in that case. Similarly, in Smith v. TIB Bank of the Keys, 687 So.2d 895, 896 n. 1 (Fla. 3d DCA 1997), the third district referred to the Act, but only to observe that it was not called upon to decide whether the statute prohibited enforcement of the confidentiality provisions of a settlement agreement in a sexual harassment case.
ACandS, Inc. v. Askew, 597 So.2d 895, 898-99 (Fla. 1st DCA 1992), interpreted and applied the Act in finding no error in the trial court's refusal to enforce a federal court protective order. However, that decision is of no use in this case, since the product involved in ACandS was asbestos, *1027 which poses a well-documented risk to public health.
Finally, both Stivers and FMCC rely on E.I. DuPont De Nemours & Co. v. Lambert, 654 So.2d 226 (Fla. 2d DCA 1995), to support their diametrically opposed positions. In that case, the plaintiff nursery owners sued DuPont, alleging that the product Benlate had damaged their ornamental plants. See id. at 227. The only damage claimed was loss of profits. See id. During discovery, "the parties introduced no evidence regarding possible health effects of Benlate, nor any evidence suggesting Benlate had caused or would cause personal injury." Id. Subject to a confidentiality order, DuPont produced discovery documents which contained confidential, proprietary, and trade secret information. See id. Third parties moved under the Act to set aside the confidentiality order. See id. The trial court set aside its confidentiality order without allowing the parties "a hearing on the merits of the Sunshine Act issues." Id. at 228.
The second district reversed the order of the trial court setting aside the confidentiality order on the ground that the parties had been denied their due process right to notice and an opportunity to be heard. See id. The court clearly did not address the question of whether Benlate posed a "public hazard" within the meaning of the statute. Stivers and FMCC rely on language in DuPont which is nothing more than a description of the posture of the case, without any precedential value for the issues presented here.
In sum, because the settlement agreement did not violate the Act, FMCC was entitled to enforce it. The trial court properly granted summary judgment.
AFFIRMED.
GUNTHER and STONE, JJ., concur.
NOTES
[1] This court has jurisdiction. See Fla. R.App.P. 9.130(a)(3)(C)(iv).
[2] See § 122.34, Fla. Stat. (2000) (concerning law enforcement officers as "high hazard" members of retirement plans); § 163.3178(2)(h), Fla. Stat. (2000) (defining "high-hazard" coastal areas as "category 1 evacuation zones"); § 230.23005(7)(c), Fla. Stat. (2000) (allowing school board to adopt policies concerning "hazards," which include "threats of nature, bomb threats, threatening messages and similar occurrences"); § 232.246(1)(i), Fla. Stat. (2000) (referring to "hazards of smoking"); § 235.19(5), Fla. Stat. (2000) (speaking of a "hazard" that "endangers the life or threatens the health or safety of students"); § 255.042(1), Fla. Stat. (2000) ("radiation hazards" in the event of nuclear attack); § 255.25(6), Fla. Stat. (2000) ("flood hazards"); § 255.553(3), Fla. Stat. (2000) ("hazard of ... asbestos-containing materials"); §§ 284.06, 590.082(1), Fla. Stat. (2000) ("fire hazard"); §§ 316.081(1)(b), 316.087(1)(a) & (b), 316.122, 316.123, 316.125(1), 316.185, Fla. Stat. (2000) ("traffic hazard"); § 327.44, Fla. Stat. (2000) ("navigational hazard"); §§ 330.27(3), 332.004(2), Fla. Stat. (2000) ("airport hazard"); § 373.316, Fla. Stat. (2000) ("hazard to the groundwater resources"); §§ 376.30(3)(a), 376.78(1), 381.0101, Fla. Stat. (2000) ("environmental and health hazards"); § 552.21(1), Fla. Stat. (2000) (explosives as "hazard to life or property"); but see § 443.021, Fla. Stat. (2000) (describing unemployment as the "greatest hazard of our economic life").